IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Alan B. Johnson

Civil Action No. 95–cv–02664–ABJ–BNB

UNITED STATES OF AMERICA, for the Use and Benefit of
BLUE STAR CONSTRUCTION SERVICES, INC.,

Plaintiff,

v.

MOUNTAIN STATES SHEET METAL
COMPANY, and NATIONAL FIRE INSURANCE
COMPANY OF HARTFORD,

Defendants.

_____

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
_____

## I. BACKGROUND

Pursuant to jurisdiction invoked under the Miller Act, 40 U.S.C. § 270[1], Plaintiff,

Blue Star Construction Company, Inc. ("Blue Star"), an asbestos abatement

subcontractor, alleges in this case claims for breach of contract, or alternatively, for

*quantum meruit* recovery, against Defendant Mountain States Sheet Metal, Inc.,

("Mountain States"), a prime contractor with the United States to furnish materials and

labor for the renovation and improvement of Building 56, Denver Federal Center.

Essentially, Blue Star contends that it was required by Mountain States to perform work

on the job beyond that described in its written subcontract for which it was not

compensated, and that it also was not paid the amounts approved for additional work

_____

[1] The Miller Act is currently codified as 40 U.S.C. § 3133.

pursuant to several change orders made to the subcontract amounts. As a separate

claim, plaintiff alleges a claim under the payment bond against Defendant National Fire

Insurance Company of Hartford ("National Fire"), the alleged bonding company.

Defendant Mountain States alleges Blue Star failed to perform satisfactorily

under the subcontract, and ultimately breached the subcontract, requiring Mountain

States to obtain another subcontractor to complete the work. Therefore, Mountain

States asserts counterclaims for damages against Blue Star, alleging breach of the

subcontract, or alternatively, under theories of *quantum meruit*, unjust enrichment and

negligence.

This case was tried to the Court on October 2-4, 1996 and again on October 6-9.

1997. Transcripts of the 1996 segment of the trial were prepared and filed on April 21,

1997 (Dkt. ## 61, 62 and 63) and on August 6, 1997 (Dkt. # 78).[2] Transcripts of the

1997 segment of the trial were filed on November 6, 1997 (Dkt. ## 88, 89, 90 and 97).[3]

On October 31, 1997, defendants moved for judgment as a matter of law under Rule

52(c), F. R. Civ P. (Dkt. # 87), asserting that the claim against National Fire must be

dismissed because plaintiff failed to introduce the alleged bond into evidence at the trial,

and that plaintiffs "quasi-contract claims" against Mountain States must be dismissed as

the subject matter of those claims is governed by the written subcontract, thus

---

[2] Dkt. # 78 contains the opening statement of counsel, paginated 1-36. The transcripts filed as Dkt. ## 61, 62 and 63 contain the trial testimony presented on October 2, 3 and 4, 1996, respectively. Since these transcript pages are numbered consecutively, they are cited in this Order as Tr. ___.

[3] The transcripts filed as Dkt. ## 88, 89, 90 and 97 contain trial testimony presented on October 6, 7, 8 and 9, 1997, respectively. Each of the four transcripts is paginated beginning with page 1. Therefore, these transcripts are cited by date and page, *e.g.* Tr. 10/6/97 at 96.

precluding such quasi-contract claims.  Plaintiff filed its opposition to the motion on November 21, 1997 (Dkt. # 91).

On November 24, 1997, in accordance with the order entered at the close of trial, plaintiff and defendants filed proposed findings of facts and conclusions of law. Apparently because the filings were sent directly to me at my chambers in Wyoming, the proposed findings were not assigned docket numbers by the Court Clerk.  Pursuant to Rule 52(a)(1), I now make the following findings of facts and conclusions of law.

## II.  FINDINGS OF FACTS

### A.  The pertinent contract provisions

On or about June 25, 1993, Mountain States entered into a contract with the General Services Administration ("GSA") representing the United States to perform renovations and improvements on Building 56 at the Denver Federal Center ("prime contract") in accordance with plans and specifications contained in the prime contract for consideration of approximately $4.4 million (Exhibits 9 and C-25).  By a contract award dated July 2,1993, although apparently not signed by Mountain States until September 22, 1993, Blue Star entered into a subcontract with Mountain States to perform part of the asbestos abatement portion of the prime contract on Building 56 (Exhibits 3 and 7).[4]

---

[4] Exhibit 3, transmitted to Blue Star by letter dated July 2, 1993, is an unsigned copy of the subcontract.  Mr. Soyars testified that he did not recall the Additional Provisions section, which are part of Exhibit 3, being attached to the subcontract submitted to him on July 2, 1993 (Tr. 231), but he testified that he signed Exhibit 7, which does contains the Additional Provisions (Tr. 232).  For convenience, the Court will refer to Exhibit 3 as the governing subcontract because that version also contains Attachments A and B, which Mr. Soyars testified were part of the subcontract submitted on July 3, 1993 (Tr. 231), while those attachments appear to have been omitted from the copy of the document that is marked as Exhibit 7.

The subcontract expressly provides that the work of Blue Star was to be performed in accordance with the drawings and specifications prepared by the architect, and in accordance with the "General Conditions, Drawings, Specifications and Addendums" that formed a part of the prime contract between Mountain States and the GSA (Exhibit 3, ¶ 1). The subcontract defines Blue Star's duties as follows:

3. Subcontractor agrees to furnish all necessary management, supervision, labor materials, tools, supplies, equipment, plans, services, sundries, appurtenances, engineering, testing and any act or thing required to fully perform the work as follows:

Perform asbestos abatement work complete, in accordance with the contract drawings and specifications for the Base Bid 1, Alternates 1, 2, 4 and Base Bid 2, without exception, and more specifically but not limited to Division 1, General Requirements; and Specification Section 02085. Blue Star Construction Services is required to provide Performance and Payments Bonds from a rated company and insurance, including but not limited to asbestos abatement insurance.

(Exhibit 3, ¶ 3). The subcontract provides for payment "for the full and complete performance of said work" in the total amount of $210,000, "subject to additions and deductions for changes agreed upon in writing or determined as hereinafter set forth," with payment by means of "progress payments" pursuant to the subcontractor's submission of "paid vouchers for all labor and materials used." (Exhibit 3, ¶ 4).

The additional provisions section of the subcontract provides that the prime contract between Mountain States and the GSA "insofar as it does not conflict with the specific provisions of this Subcontract is incorporated into this Subcontract." (Exhibit 3, additional provisions, ¶ 1). The additional provisions further provide that the subcontractor has investigated the conditions affecting the work, and that any failure of the subcontractor to acquaint itself with available information will not relieve it from properly estimating the cost of performing the work (*Id.* at ¶ 4).

With respect to changes in the work contracted for, the subcontract, in pertinent part, provides as follows:

> Contractor may, on written order and without notice to any surety, make changes in the work contracted for and Subcontractor will proceed with the work as directed. If such changes cause an increase or decrease in the cost of performance or in the time required for performance, an equitable adjustment shall be made and this Subcontract shall be modified in writing. If the cost of the work performed as a result of the change can not be mutually agreed upon by the Contractor and Subcontractor, then Contractor shall settle such dispute based on Subcontractors proof of labor, material, tools and equipment furnished plus overhead and profit allowed by the contract documents.

*Id.* at ¶ 12.

The subcontract also provides that the subcontractor shall be bound by the decision of those authorized by the Contractor, Subcontractor and jointly to make decisions as to the meaning of any of the plans, specifications, details and contract provisions that affect the work hereby subcontracted to Subcontractor. *Id.* at ¶ 27. Moreover, the subcontract provides that the Subcontractor agrees to perform his work in accordance with Contractor's schedule, and that the schedule may be revised by the Contractor with updated schedules without changing any of the terms or conditions of the subcontract, and further that the Subcontractor waives any and all claims and releases the contractor from any delays, acceleration and extra costs attributable to scheduling, interference or failure to coordinate. *Id.* at ¶ 35.

In addition, the subcontract specifies that any claims by the Subcontractor for damages or additional compensation will made to the Contractor in time for Contractor to present such claims to the owner, here the GSA, in accordance with the procedures for submitting such matters as specified in the prime contract between Mountain States and the GSA. *Id.* at ¶ 28. The subcontract provides that Blue Star will commence

performance of the work within three days after notice from Mountain States. *Id.* at ¶ 23.

### B. Blue Star's Claims

Blue Star commenced work on the Building 56 job site on September 14, 1993, when it was called upon to assist in the cleanup of asbestos spills caused by other subcontractors (Tr. 27-28). This work was outside the scope of Blue Star's subcontract (*Id.*).

As explained by James Soyars, Blue Star's project manager, it commenced performance of asbestos abatement work covered by the subcontract on September 16, 1993 (Tr. 28). It continued to work on the project until at least October 24, 1994, at which time its liability insurance lapsed and it could no longer work on the project in accordance with the requirements of the subcontract (Tr. 103-04; Exhibit 3 at ¶ 31). Blue Star claims that during the approximately 13 months it worked on the Building 56 site, there were several general situations and specific occasions where it was called upon or required by Mountain States to perform work beyond the scope of its subcontract, for which it now seeks additional compensation.

First, Blue Star claims that it was required to work in more than one area of Building 56 at the same time, purportedly contrary to the specifications of the prime contract. It claims that the work in multiple areas increased the costs of operations beyond what was projected when it bid the job, and therefore this method of work was beyond the scope of its contract for which it claims additional compensation (Tr. 31-32, 34-35, 76-78).

Second, it claims that on occasions when it was not permitted to work in an entire

6

area at one time, it was required to create more asbestos containment structures, and structures of different sizes and types, purportedly contrary to the specifications of the prime contract. It claims that increasing the number of containments and varying their size and quality was more costly, that it had not projected such containments when it bid the job, and therefore such work was beyond the scope of its contract for which it claims additional compensation (Tr. 31, 73-80).

Third, it claims that it was required to remove asbestos from heating pipes in the building while the pipes were still hot, purportedly contrary to the specifications of the prime contract. It claims that work on hot pipes was more costly, that it had not projected work on hot pipes when it bid the job, and therefore such work was beyond the scope of its contract for which it claims additional compensation (Tr. 85-87).

Fourth, Blue Star claims that it was advised by Mountain States at various times that it was behind schedule on the job, and although it may have disputed the scheduling, it nonetheless responded by hiring additional workers or procuring additional equipment, purportedly beyond the scope of its contract for which it claims additional compensation (Tr. 65-66, 100).

Fifth, Blue Star claims that dust created by other subcontractors on the job negatively affected the air samples Blue Star was required to collect and test for asbestos particles, and that Mountain States did not rectify the situation when it was advised by Blue Star. Blue Star claims that it was therefore required to either procure additional equipment to respond to the dust problem, and to take and pay for the testing of additional air samples, beyond that contemplated by its bid, purportedly beyond the scope of its contract for which it claims additional compensation (Tr. 68-69).

For the work it claims was beyond the scope of its contract, which is not otherwise addressed by the change orders discussed below, Blue Star is seeking an award of $100,000, plus overhead and profit on that amount of $21,000 (Plaintiff's proposed findings, pp. 11, 12).

In addition, it is undisputed that early in the project unanticipated lead paint was encountered on the walls in an area of Building 56 referred to as the Calorimeter Laboratory (Tr. 66). As a result, Blue Star was required to perform asbestos removal from around those walls, an approach not anticipated by the subcontract. Mountain States agreed to seek a change order from the GSA with respect to the extra costs incurred due to the discovery of the lead paint and the delays it caused in the entire project for several subcontractors including Blue Star. The change order came to be labeled CE 50 (Tr. 66-68, 90).

Blue Star initially submitted a statement to Mountain States claiming cost overruns due to the lead paint situation in the amount of $140,188 (Exhibit 24). After some delay in providing Mountain States with satisfactory documentary support for this claim, Blue Star apparently revised its claim down to $82,867.94 (Exhibit 28), and later to $76,865 (Exhibits 141 and 142). Blue Star claims that Mountain States negotiated with the GSA over this claim, eventually accepted $50,000 for CE 50, but withheld payment from Blue Star as an offset against the damages which Mountain States claims it is owed (Plaintiff's proposed findings, ¶ 24). Blue Star asserts it is entitled to damages based on its final estimated amount at $76,865 (*Id.* at 12).

Blue Star also claims that there were eight other change orders providing for the payment of additional amounts for work performed by Blue Star, which were submitted

by Mountain States and approved by the GSA, in the aggregate amount of $22,354. Blue Star asserts Mountain States has withheld payment of this amount from Blue Star as an offset against the damages which Mountain States claims it is owed (Plaintiff's proposed findings, ¶ 25). Blue Star also asserts that for the initial clean up project that preceded the commencement of work under its contract, it is entitled to damages of $720 (Plaintiff's proposed findings, ¶ 25).

### C. Mountain States' Claims

Mountain States asserts, and it is not disputed, that Blue Star's liability insurance lapsed as of October 1994 (Tr. 104; Exhibit 169), placing it in violation of the provision of the subcontract requiring Blue Star to maintain liability insurance (*see* Exhibit 3 ¶ 3; additional provisions, ¶ 31; Tr. 145). It is also undisputed that on or about October 19, 2004, Mountain States advised Blue Star that its subcontract would be cancelled if it did not promptly furnish certificates of insurance (Exhibit 38; Tr. 440-41). Blue Star did not do so, and on or about October 24, 1994, Mountain States' project supervisor, Frank Steele, advised Blue Star not to return to work on the Building 56 project until it could furnish adequate proof that it had procured liability insurance (Tr. 10/6/97 at 128-29). According to Mountain States the contract with Blue Star was not cancelled (Tr. 441, 443-44), but as Blue Star never provided certificates of insurance, it did not return to work on the project. As described by Ms. Denise Soyars, Blue Star's president, the company "declined" to return to work because it did not have the money to reinstate its insurance (Tr. 10/8/97 at 38).

Mountain States claims that as of October 24, 2004 when Blue Star left the job, substantial portions of the asbestos abatement work covered by Blue Star's subcontract

to be performed in areas of Building 56 referred to as Areas 1500, 1700 and 2700 had not been completed.  Mountain States thereafter contracted with DLM, Inc. ("DLM") to perform portions of the asbestos abatement work that remained to be completed in those areas.  In addition, Mountain States claims that Blue Star left Areas 1700 and 2700, where it had been removing asbestos, in such a state that emergency cleanups in each area  were required.  Mountain States hired DLM to perform the purported emergency clean ups.  Mountain States seeks as damages the amounts it paid to DLM for the emergency clean ups, and the excess amounts paid to complete the asbestos abatement work covered Blue Star's subcontract.

In addition, Mountain States claims that Blue Star caused damages to the Building 56 property for which Mountain States was charged by the GSA, and it seeks to recover those items of damages.  Mountain States also seeks to recover from Blue Star for the value of its equipment it allowed Blue Star to use during the course of the project, as well as for the alleged value of labor it furnished to Blue Star.

In sum, Mountain States contends that after setting off amounts due to Blue Star, it is damaged in the net amount of $107,785.58 due to the combination of Blue Star's alleged failure of performance, and damages it caused which Mountain States was required to rectify (Defendants' proposed findings, ¶ 353).

## D. Preliminary Findings

Mountains States apparently asserts that Blue Star was in breach of its subcontract from the outset of the work because it did not provide a performance and payment bond from a rated company as required by paragraph 3 of the subcontract (Exhibit 3, ¶ 3). However, there is ample evidence that Mountain States was aware that Blue Star had not procured the "rated" performance bond, and yet it authorized Blue Star to proceed with the work without the bond in place (Exhibits 5 and 6). Mountain States also offered to advance funds to Blue Star to pay for the bond once obtained (*Id.*). Although it appears the rated performance bond was never obtained, I find that Mountain States waived this condition of the subcontract and the failure of Blue Star to obtain the rated performance bond is not fatal to its claims for breach of contract or *quantum meruit*. In addition, since Mountain States waived the requirement of a rated bond, it is not entitled to deduct the "cost" of the non-purchased bond from the base amount of Blue Star's subcontract as it apparently seeks to do (*see* Defendants' proposed findings, ¶ 347).

The subcontract also required that Blue Star obtain liability insurance, including asbestos abatement insurance and workmen's compensation insurance, with minimum specified coverages (Exhibit 3, ¶ 3; additional provisions ¶ 31). I find that this condition of the subcontract was not waived by Mountain States. Indeed, Mountain States assisted Blue Star in paying the premiums for some of this insurance by providing a check in the amount of $22,470 on September 24, 1993, payable jointly to Blue Star and its insurance agent for the purposes of paying the premiums due (*see* Exhibits 35 and 109). The insurance agent testified that he endorsed the check and gave it back to

Blue Star (Tr. 10/8/97 at 68). While the record is not clear as to exactly what happened to the proceeds of the check, it is clear that Mountain States did not intend to waive the contract requirement that Blue Star have insurance coverage. Mountain States advanced the $22,470 with the intention that the advance be deducted from the payments due to Blue Star under it subcontract (Tr. 435). Blue Star does not contest that "the entire $22,470 should be credited against Blue Star's contract amount." (Plaintiff's proposed findings, ¶ 18).

Blue Star offered no specific evidence at trial in support of its Miller Act claim against National Fire Insurance under the alleged payment bond (Amended Complaint, First Cause of Action), in particular, the bond itself. Moreover, plaintiff's proposed findings of fact and conclusions of law offers no information whatsoever regarding the claim under the payment bond. While plaintiff argues that failure to offer the bond into evidence is not fatal to its claim under the Miller Act (Plaintiff's Response to Motion for Judgment as a Matter of Law, (Dkt # 91) at 1-2), the absence of the bond being in evidence makes it difficult to make findings as to the provisions of the alleged bond.

However, defendants do not deny that a payment bond was furnished by National Fire as surety for Mountain States (*see* Defendants' Motion *in Limine* Regarding Damages under Miller Act Claim (Dkt. # 27) at 1). In fact, a copy of the payment bond is attached to the defendants' motion. Thus, I will not find that plaintiff's failure to offer the payment bond into evidence precludes its Miller Act claim.

It is undisputed that eight change orders pertaining to work performed by Blue Star beyond the scope of its subcontract were submitted by Mountain States and approved by the GSA. These change orders are CO #19, #27, #54, #55, #63, #67 #68

12

and #78 (Plaintiff's proposed findings, ¶ 25; Defendants' proposed findings, ¶¶ 281-289). The total value of these eight change orders is $22,354 (*Id.*).

It is also undisputed that Blue Star was requested by Mountain States to perform clean up of spills in the Calorimeter Lab and in Area 1600, work outside the scope of Blue Star's subcontract (Plaintiff's proposed findings, ¶ 25). The total value of the clean up work was $720 (*Id.*, Defendants' proposed findings, ¶¶ 290-91).

There is no dispute that the discovery of unanticipated lead paint in Building 56 increased the costs of the work to all parties concerned (Plaintiff's proposed findings, ¶ 10; Defendants' proposed findings, ¶¶ 9-10). In order to compensate the contractor and the subcontractors, the GSA issued change order CE-50 (*Id.*). The dispute between Blue Star and Mountains States relates only to the amount of additional funds that would be added to Blue Star's contract price based on CE-50.

Blue Star claims the amount to be allowed should be $76,865 (Plaintiff's proposed findings, at 12). That amount was understood by the GSA to be the final amount Blue Star sought to submit to the GSA through Mountain States in connection with CE-50 (*see* Exhibits 141 and 142). The GSA's representative, Mr. John Kidd, who prepared Exhibits 141 and 142, testified that the $76,865 amount set forth as an "objective" on his worksheet was a "not to exceed" amount, or maximum amount that he would pay (Tr. 340). Mountain States asserts that the amount to be allowed should be $50,000, an amount it negotiated with Mr. Kidd in May 1995 (*see* Exhibit 142; Tr. 10/8/97 at 9-10). I find that the proper amount to be allowed as an addition to the Blue Star subcontract pursuant to CE-50 should be $50,000 for the following reasons.

By a comprehensive letter dated March 24, 1995, Mr. Kidd requested Ms. Rene

Robertson, vice president and project manger of Mountain States, to furnish additional information to support the proposal for CE-50 (Exhibit 81).  A portion of Mr. Kidd's letter related specifically to Blue Star's request for additional fees, requesting a further explanation as to how the amount requested had been calculated.  Ms. Robertson testified that she did her "best" to respond to Mr. Kidd with respect to the issues raised in his letter, but was unable to contact Blue Star to obtain information from it because it was no longer working at the site, and its telephone and fax lines had been disconnected, a fact admitted by Mr. Soyars (Tr. 10/9/97 at 117-118; Tr. at 97).  She thereafter met with Mr. Kidd on or about May 25, 1995, and negotiated the amounts to be allowed to each of the subcontractors under CE-50 (*Id.* at 120-22).  Ms. Robertson testified as to the issues raised by Mr. Kidd regarding the amount of Blue Star's request, and that he offered only $20,000 for Blue Star's claim (*Id.* at 122).  The negotiations ultimately yielded an allowance to Blue Star of $50,000 (*Id*).

I find Ms. Robertson's testimony to be credible and consistent with the description of negotiations as provided by the testimony of Mr. Kidd (*see* Tr. 342-43).  I also find that Ms. Robertson negotiated in good faith on behalf of Blue Star.  Moreover, as both Mr. Kidd and Ms. Robertson pointed out in their testimony, Mountain States had every incentive to realize the highest amount on behalf of Blue Star because it was entitled to 10% of the amount as a "commission" under its contract with the GSA (*Id.* at 123-24; Tr. 329-30).

Pursuant to these preliminary findings, the base amount of $210,000 allowed to Blue Star pursuant to its subcontract, plus the above allowed amounts for change orders or other agreed upon work outside the scope of the contract, totals $283,074.  I also find

that it is undisputed that the amount paid by Mountain States to Blue Star directly, or indirectly on its behalf to its employees and suppliers is $239,905.89 (Plaintiff's proposed findings at 12; Defendants' proposed findings, ¶ 337; Tr 10/9/97 at 154). However, as noted above, Blue Star claims additional amounts for work it asserts was beyond the scope of its subcontract pursuant to the description of its work as contained in the plans and specifications. Mountains States disputes that Blue Star is owed any more on such claims.

### E. Pertinent Requirements of the Plans and Specifications

The plans for the renovations to Building 56 divide the project into different areas by number or by type of room within the building. Blue Star was scheduled to perform asbestos abatement in the Calorimeter Laboratory, Areas 1600, 1700, 1800, 1900 North, 1900 South, 2700, 2600 and a boiler room in Area 1800 (Tr. 45-47; Tr. 10/9/97 at 18).

The specifications of the prime contract primarily addressing asbestos abatement are contained in section 02085 and it is this section of the specifications that Blue Star contracted to perform (*See* Exhibit 3, at 1). Although the specifications as a whole are quite voluminous, and are contained within Exhibit C-25, some separate pages of the specifications relevant to Blue Star's claims have been marked as individual exhibits and are identified in plaintiff's case as the specifications plaintiff was relying upon when it bid this job. For ease of reference, the Court will refer to these separate exhibits.

Exhibit 66, a page from the specifications marked as part 02085, contains a subsection 1.6 titled "Sequencing/Scheduling." That subsection provides, in essence, that Blue Star (the contractor) shall coordinate work hours for removal, containment, and disposal of asbestos with the building manager and GSA representative, and that the

schedules shall be arranged at least 14 calendar days in advance of any asbestos abatement.  The subsection also provides that "[a]batement will be phased by building section.  Abatement will take place in one area at a time. Preparations may be made in areas other than the work area, but no new removal shall commence before the abatement work in progress has been cleared."   Frank Steele, the on-site supervisor for Mountain States, testified that he was aware that the specifications required that asbestos abatement be performed in only one area at a time (Tr. 10/6/97 at 96).

Exhibit 67, another page from the specifications marked as part 02085, contains a subsection 3.4 titled "Glovebag Removal Method."  A glove bag was described by plaintiff's project supervisor, James Soyars, as "simply an asbestos disposal bag that you attach directly to the pipe insulation" and seal it around the section to be removed (Tr. 30). Subsection 3.4 provides that steam pipe insulation, as well as domestic water, drain and hot water heat pipe insulation, shall be removed by the glove bag method, and provides the technical requirements for the glove bag itself (Exhibit 67, 3.4A.1 and 2). The specification also provides for shutting off "all sources of heat to objects to be worked on" and provides that the contractors "shall not work on objects above 150 degrees Fahrenheit."  Exhibit 67, 3.4C.  Frank Steele testified that he was familiar with a specification requiring that there was not to be work performed on objects above 150 degrees Fahrenheit (Tr. 10/6/97 at 117). Plaintiff also emphasized that specification 3.2B.2 provided that the contractor, Mountain States, was responsible for supplying the facilities necessary to supply temporary heat to the building during the renovation (*see* Exhibit 64).

Rene Robertson, Mountain State's project manager, testified that pursuant to a

subsequent change in the specifications, specifically amendment 4, the asbestos subcontractor was to be responsible for coordinating demolition of the steam and condensate pipes in a manner that would allow the occupied areas serviced by steam to remain active (Tr. 10/9/97 at 126). Pursuant to that amendment to the specifications, the asbestos contractor was thus required to remove the asbestos insulation without damaging the pipe so that the pipe should remain in service for as long as the steam system is in use (Exhibit 146 at page 6 of 8).

Plaintiff's representative, James Soyars, testified that "the procedures and types of containments are drawn out in the specifications as to how each type of work is going to be performed." Tr. at 31. Soyars did not, however, identify a specific plan or specification that provides how containments were to be employed, nor did he identify a plan or drawing that specifically depicts the number or types of containments to be employed in any given area.

I note that copies of the architectural drawings for the different areas in which Blue Star was to perform asbestos abatement were marked as Exhibits 16 through 23. Each drawing contains the same eight "general notes for asbestos abatement" describing in a general way the manner in which abatement was to be performed. Each separate drawing also has "key notes" for the specific area depicted, which describe in somewhat more specific detail the work to be performed in that area. The key notes are identified by letters, A through G, depending on the number of key notes per drawing. I will refer to those as "key letters." The key letters are stamped on the drawings of the different areas to inform the reader of the plans of the specific area where the work described in the key notes was to be performed. Pertinent to Blue Star's claims is general note number 7,

which states that "unless otherwise noted, use of keynotes includes the entire area . . . multiple use of same note for same [area] is for general information only and does not limit scope."  I do not not read any of the general notes or the key notes as depicting the number or types of containments to be employed in any given area.

Mr. Soyars did describe the number and types of containments he anticipated Blue Star would need to erect in each area when he prepared his bid (Tr. 73-76), and he did attempt to indicate on various drawings the type of containment and its locations in the different areas of the project (Tr. 70-76).  He apparently inferred that each key note indicated the need for one containment only in that location.  However, Soyars admitted on cross-examination that there was nothing in the specifications that restricted the number of containments to only one per work area, or that restricted in any way the number of containments per work area (Tr. at 276).

With respect to the issue of scheduling and timing of the work to be performed by Blue Star, it is undisputed that the specifications and plans provided for the creation of what is called a critical path method schedule, or "CPM," although the parties did not cite to an express specification that provides for a CPM.  As described by Mr. Soyers, the CPM sets forth a baseline schedule for the duration of the project which sets forth the different trades working on the project, establishes a baseline for the number of days for each portion of the work to be performed by each of the different trades, and indicates critical items that must be completed before other work can proceed (Tr. at 48).  As described by Frank Steele, defendant's representative, it is a schedule of work progress throughout the job (Tr. 10/6/97 at 100).  The original CPM schedule for the Building 56 project is Exhibit 41; a revised CPM schedule, apparently issued in January 1994, is

marked as Exhibit 58.

Exhibit 65, a page from the specifications for the Building 56 project, provides that the CPM schedule will identify the order in which the contractor plans to accomplish the work. This plan is subject to change by the CO (Contracting Officer) based on the requirements of the government prior to approval. In addition, as noted above, the sequencing and scheduling specification from the asbestos abatement section provided for the contractor to create a schedule 14 days in advance of asbestos abatement (Exhibit 66). It appears that Mountain States and Blue Star sought to comply with this directive by preparing what were referred to as "three-week schedules" which were prepared periodically and describe the abatement work to be performed during the subsequent three week period. The three-week schedules were marked collectively as Exhibit 161.

Blue Star did not cite to a specific portion of the specifications that relates to the level of dust in the air, or the treatment of situations where dust may affect the air samples being taken by the asbestos abatement subcontractor. However, Mountain States acknowledged to Blue Star that there was a requirement to "preclean in areas where abatement is being performed" and agreed that if a more expensive air sampling was required to determine if the air samples failed because of dust or because of asbestos, Mountain States would pay for the additional costs unless the air samples failed due to asbestos fiber (*see* Exhibit 32; Tr. 10/9/97 at 90).

### F. Analysis of Blue Star's Claims that it Performed Work Outside the Scope of the Subcontract

It appears undisputed that Blue Star was requested by Mountain States to

perform work in more than one area at a time.  Mr. Steele's testimony, his daily log and at least some of the three-week schedules seem to confirm that there was overlap between the areas of Blue Star's work (Tr. 10/6/97 at 96-98, 139-40; Exhibits 157 and 161).

Mr. Soyars testified that there were "many times during the course of the job that Blue Star was required to perform abatement work in more than one area at a time" and that such work was directed by Frank Steele (Tr. 31).  He also testified that he raised objections with Mr. Steele, Ms. Robertson, and eventually with the GSA representatives, Mr. John Kidd and Ms. Diane Railsback, when Blue Star was required to perform asbestos abatement work in multiple areas (Tr. 33-34).  He did so because he believed such scheduling was contrary to specification 1.6B (Tr. 32-33; Exhibit 66).  Soyars did not testify as to the response he received from the GSA, other than to say that Mr. Kidd referred him back to Mountain States (Tr. 34).  He also testified generally that he was directed by Mr. Steele and Ms. Robertson to perform "abatement work in more than one area at a time," and when he protested he was told by Mr. Steele that he had misread the plans and specifications (Tr. 123).

Mr. Steele testified that although Blue Star may have been performing work in more than one area on the same date or at the same time, it was not necessarily doing actual asbestos abatement work in more than one area simultaneously (Tr. 10/6/97 at 99, 111).  What he suggested is that the entries in his log or on the three-week schedules reflect is that Blue Star was setting up to perform abatement in one area, or was removing abated material from another area, while performing actual abatement in another area (Tr. 10/6/97 at 137, 139-40).

As I read the contract specifications pertaining to sequencing of abatement, they plainly specify that abatement will take place in one area at a time.  Yet they also provide that the abatement contractor can be scheduled to prepare areas other than the work area for abatement, but the actual removal may not commence before the abatement work in progress has been cleared (Exhibit 66).  The evidence is not clear in this case as to whether Blue Star was required to perform actual abatement and removal of asbestos in two different areas simultaneously, or whether it was merely scheduled to prepare one area while another was still being abated.  Moreover, there was no clear showing as to which two areas were supposedly being abated at the same time.  In one instance, Mr Steele admitted that the containment spanned two areas, but this was due to the requirements of the GSA. Therefore I find that plaintiff did not prove by a preponderance of the evidence that it was required to perform actual abatement activities in more than one area simultaneously contrary to the provisions of the specifications.  Nor did it quantify the additional costs it purportedly incurred from any specific situation where it claimed it was directed to perform asbestos abatement in two different areas at the same time.  Moreover, as further discussed below, even if the plaintiff was required to perform actual asbestos removal in more than one area at the same time, the evidence does not show that plaintiff properly and timely submitted a claim or request for equitable adjustment for such purported additional work.

I also find that Blue Star may well have constructed more containments than it had planned for when it prepared its bid for the job, as well as types of containments that may have differed from what it had originally planned.  However, as already indicated I find no provisions in the plans or specifications that prescribe the number or type of

containments to be built in each of the different work areas. The fact that Blue Star had expectations as to the number and types of containments when it made its bid was the product of its own analysis of the job, and was not dictated by the plans or the general contractor.

Moreover, the subcontract plainly provides that the subcontractor takes responsibility for investigation of the conditions affecting the work site, and any failure of the subcontractor to acquaint itself with the available information "will not relieve it from properly estimating the cost of performing the work," and the general contractor assumes no responsibility for the interpretations made by the subcontractor (Exhibit 3, additional provisions at ¶ 5). The evidence at trial was undisputed that Blue Star did not attend the "walk through" of the project that occurred in April 1993 (Tr. at 21). Although such "walk through" was not mandatory, if the failure to attend resulted in an inadequate understanding of the nuances of the project, the fault is Blue Star's and not that of Mountain States. Moreover, as further discussed below, even if the plaintiff was required to construct more and different types of containments than it had planned for when it prepared its bid for the job, and even if that work was outside the scope of its subcontract, the evidence does not show that plaintiff properly and timely submitted a claim or request for equitable adjustment for such purported additional work.

Similarly, I find nothing in the plans and specifications that provides for the number of employees that Blue Star was required to provide to the job as a whole or to any particular part of the job. The evidence does not plainly show that Blue Star furnished more employees to any particular part of the job than it originally anticipated because Mountain States erroneously claimed by that Blue Star was "behind schedule."

Indeed, the testimony of Soyars appears to indicate agreement that at certain points in time it was behind schedule (Tr. 100, 124). And while Mr. Steele testified that he may well have told Blue Star to "man up" on the job, that is to add workers when they were behind schedule (Tr. 10/6/97 at 111), Soyars testified that at the time he did not tell Mountain States that he felt this request amounted to a changed condition of the contract (Tr. 183). Nor does the evidence adduced by plaintiff permit a quantification of the number of employees allegedly added by Blue Star to meet what it describes as the demands of Mountain States.

While the CPM, the three-week schedules and the various communications between the parties depict how the job was to be carried out, like any construction job there were unforeseen events that effected delays or required interruptions of the planned schedule. Certainly the discovery of the presence of lead paint in the building, for example, required a major modification to the schedule, and may well have caused Blue Star to incur additional costs. That issue was dealt with by CE 50, as discussed above. However, to the extent that there may have been other schedule delays that caused Blue Star to incur additional expense, the evidence does not appear to reflect that it submitted quantifiable, timely claims for the excess costs, nor does the evidence show that plaintiff properly and timely submitted a claim or request for equitable adjustment for such purported additional work.

Mr. Soyars testified that there were occasions when Blue Star was required to perform abatement work on steam pipes that had not been cooled below 150 degrees as required by the plans and specifications, and that measurements taken indicated temperatures of 204 to 212 degrees (Tr. 85-86). He further testified that he voiced

objections regarding these conditions to Mr. Steele, and that while Mountain States attempted to make an accommodation by rescheduling the work to nights or evenings, this solution was not efficient and did not leave sufficient time for Blue Star to do the work (*Id.*). He further explained that having to perform abatement on hot pipes changed the nature of the containments, and required additional time and additional equipment, thus increasing the costs to Blue Star (Tr. 86-87).

Mr. Steele testified that Blue Star did complain about having to perform abatement on pipes that were "too hot," (Tr. 10/6/97 at 114). Although he disputed whether the pipe temperatures were taken by Mountain States, or at all (*Id.* at 117-19), and where the responsibility lie to take the temperatures of the pipes, (*Id.* at 152-53), he does not appear to dispute that Blue Star was required to work on pipes that were above 150 degrees.

I find that the plans and specifications expressly provide that asbestos abatement was not to occur on steam pipes that were above 150 degrees, and yet the subcontractor was also required to work to perform its work in a manner that allowed the heat in the building to remain on as long as possible (*see* Exhibit 146). It appears that Blue Star may well have incurred additional costs due to the adjustments necessary to accommodate these possibly conflicting requirements. However, plaintiff did not produce evidence that shows by a preponderance of evidence the amount of additional costs attributable to this change in the scope of the work. Moreover, as with the other claims, the evidence does not show that plaintiff properly and timely submitted a claim or request for equitable adjustment for such purported additional work.

Plaintiff's claim for additional costs of air sampling due to the unanticipated level

24

of dust created by the other subcontractors' work is a claim that was raised with Mountain States, and as show by the evidence was addressed by Mountain States on an equitable basis. Ms. Robertson testified that Mountain States agreed to pay for additional air sample testing costs necessitated by the dust, unless the additional testing showed the failure of the sample was due to asbestos. She further testified, and it was not disputed, that at least as of January 1994 Mountain States paid for the additional samples that fell within the contract requirements (Tr. 10/9/97 at 90-91; Exhibit 34). She further testified that there was no request from Blue Star for an equitable adjustment for any air samples that Mountain States did not pay for (*Id.*). I find no evidence that disputes the testimony provided by Ms. Robertson.

### G. The Absence of Requests for Change Orders or Equitable Adjustments

The Blue Star subcontract provides that the asbestos abatement would be performed for the fixed price of $210,000, "subject to additions and deductions for changes agreed upon in writing or determined as hereinafter set forth . . . " (Exhibit 3 ¶4). The pertinent additional provisions regarding changed scope of work provide essentially that if changes in the work contracted for cause an increase in the cost of performance, or in the time required for performance, an equitable adjustment shall be made, and the subcontract shall be modified in writing, and if the cost of the additional work can not be mutually agreed upon, the contractor and the subcontractor shall settle such dispute upon the subcontractor furnishing proof of the labor, materials and furnished, plus overhead and profit (*Id.*, additional provisions, ¶12). In addition, the request for the change must be timely submitted so that the contractor can present the claim for extra monies to the owner (*Id.*, additional provisions, ¶ 28).

25

Mr. Soyars testified as to his understanding of these provisions. In the event Blue Star was requested to perform work outside the scope of the contract it would have to file a document called a "request for information" or RFI and the GSA would consider whether a change order was justified. The pricing of the change order would be "run through" every subcontractor impacted by the delay, the expense or the extra work and the proposed price would be submitted back to the GSA (Tr. 66-67). Ms. Denise Soyars testified that she prepared RFIs on many occasions (Tr. 10-8/97 at 26), understanding that they were part of the process for obtaining additional funds. Mr. Soyars understood that the RFIs were to be addressed to Ms. Robertson at Mountain States (Tr. 294).

As indicated above, Blue Star did submit RFIs or requests for equitable adjustments. On at least nine occasions they were approved and additional payments were authorized, and on other occasions the change requests were not approved (*see, e.g.* Exhibits 165, 166, 167 and 189). However, with respect to the items of work purported to be outside the scope of the subcontract, discussed above in subsection F of this order, I find that Blue Star did not submit proper or timely change orders.

First, with respect to some of these specific assertions relating to work outside the scope of the contract, the Blue Star witnesses admitted that they did not submit RFIs or requests for equitable adjustments (Tr. 167-69; Tr. 10/8/97 at 64, 67, 69). Second, to the extent Ms. Soyars testified that she submitted a "stack" of RFIs to Frank Steele in October 1994, at about the time Blue Star was going off the job, I find her testimony to not be credible.

Essentially, Ms. Soyers identified 14 one-page documents, each titled "request for information" and each dated October 20, 1994 (Exhibits 168, 176-188). She testified that

these documents were RFIs she prepared on October 20, 1994, shortly before Blue Star's work at the Building 56 project was terminated (Tr. 10/8/97 at 31).  She stated that she prepared them at that time because she wanted to "make sure they got into MSSM [Mountain States] before we were totally off the site" and because Blue Star wanted to get paid for these items.  *Id.*  She stated that she handed the "pile" of documents to Mr. Steele in October 1994, and he "put them in the trash."  *Id.* at 32.

Although Ms. Soyars did not explicitly so testify, it is apparently Blue Star's point that because Mr. Steele discarded the RFIs, the claims for change orders or equitable adjustments relating to the subject matters described in these 14 documents were never processed and the claims were not paid.  Moreover, although the 14 documents do not set forth a dollar value for the amount of the claim, and although Ms. Soyars did not supply any dollar amounts through her testimony, it appears that Blue Star is claiming that the aggregate value requested by these documents totals $100,000 plus overhead and profit of $21,000 (*see* Plaintiff's proposed findings, at 12).  Thus, Blue Star is requesting damages of $121,000 relating to the work described on these 14 documents.

Mr. Steele testified that he did not receive Exhibits 168 and 176 through 188 from Ms. Soyars, and he never saw them until after this lawsuit was filed (Tr. 10/6/97 at 141-42).  Although the 14 documents are addressed to Ms. Robertson, Ms. Soyars testified that she did not mail them to Ms. Robertson (Tr. 10/8/97 at 56).  Nor, after watching Mr. Steele throwing the documents into the trash, did she send copies to the GSA, or to anyone (*Id*).  Furthermore, Ms. Soyars did not write to Ms. Robertson or to the GSA, or report to anyone, that Mr. Steele had trashed the documents (*Id.* at 56-57).  On cross-examination, counsel for Mountain States impeached Ms. Soyars' trial testimony

regarding the 14 documents through her deposition testimony given on June 10, 1996, when she stated that after handing Mr. Steele the pile containing the RFIs, she did not know what happened to the documents (*Id.* at 59).

It also appears that these documents were not produced by Blue Star as part of its Rule 26(a) discovery in this case, nor were these 14 documents produced at the time of Ms. Soyars deposition in June 1996 (Defendants' Motion in Limine (Dkt. #29 at 2). The documents themselves were not produced to Mountain States until discovery responses were served by Blue Star on or about July 30, 1996 (Defendants' Motion in Limine (Dkt. #29) at 2-3; Plaintiff's Response to Motion in Limine (Dkt. # 36) at 2). Plaintiff admitted that the documents produced were not copies from Blue Star's files, but that they were printed from the memory in its computer for the purpose of producing them to Mountain States (Plaintiff's Response to Motion in Limine (Dkt. # 36) at 4). In attempting to explain why these documents were not timely produced, Ms. Soyars testified at trial that the file copies of these documents were among the documents that were stolen when Blue Star suffered a burglary in July 1995, although her testimony was vague as to whether the documents were stolen from a Blue Star storage unit that was burglarized, or from Ms. Soyars' home office which she claimed was burglarized on a separate occasion (Tr. 10/8/97 at 30-31).

Although these 14 documents were admitted as evidence at trial over defendants' objection as to their authenticity, I stated at the time that they were admitted subject to evaluation of credibility and I would give such weight, if any, as appropriate (Tr. 10/8/97 at 29). I now find that Ms. Soyars' explanation of why these documents were not produced at the outset of the case to be a bit farfetched. I further find her testimony that

she tendered them to Mr. Steele in October 1994 to be lacking in credibility.  If she witnessed Mr. Steele throw these documents into the trash, given their importance to Blue Star's getting paid for the work it claimed to have done beyond the scope of its contract, it would only be reasonable to expect her reaction to include contacting Ms. Robertson, or the GSA, or someone about what had purportedly occurred.  After all, Ms. Soyars had no reluctance to advise the GSA of other issues when Blue Star objected to the conduct of Mountain States (*see* Exhibit 175).  Moreover, each of the 14 documents ends with the same comment, stating that if direction is not received by Blue Star within seven days, "we will pursue all means available to collect the monies due us."

Furthermore, the subcontract expressly provides that if the subcontractor and contractor cannot mutually agree on the amount to be paid for additional work, the subcontractor must submit "proof of labor, material, tools and equipment" for which it is claiming payment (Exhibit 3 at ¶ 12).  Blue Star understood this requirement, and met it with respect to the other change orders that were approved (*see, e.g.* Exhibit 165, 166 and 167).  These 14 documents, however, contain no detail whatsoever as to the amount of labor, the charges for materials, or the amounts sought for tools and equipment.

In addition, I find no basis in the record for determining that the actual cost to Blue Star of performing this purported additional work was $100,000, or that the reasonable value of such purported extra work was $100,000.  Although Blue Star offered into evidence its damage summary, Exhibit 162,[5] and although its expert witness, John

---

[5] Exhibit 162 and Exhibit 198 appear to be two copies of the same document.

Scherling, testified about the items on the exhibit, he did not give an opinion tying the alleged damages to the $100,000 amount claimed by Blue Star (see Tr. 10/6/97 at 47-48).

In sum, even if it were found that Blue Star was required by Mountain States to perform work outside the scope of its subcontract as it now claims, it failed to timely and properly submit RFIs or requests for equitable adjustments for that work as required by the provisions of the subcontract, and it did not demonstrate by a preponderance of the evidence that the cost of such work, or its reasonable value, was $100,000. The subcontract provided a mechanism for Blue Star to address the claims being made by Blue Star, but the provisions of the contract were not followed with respect to this claim for extra work.

## H. Analysis of Mountain States' Counterclaims

### 1. Miscellaneous items of damage

Blue Star does not dispute that it caused some damages on the Building 56 project for which it is liable to Mountain States. Specifically, it concedes liability for water damage in the amount of $3,386 and wall damage in the amount of $2,825, for a total of $6,211 (Plaintiff's proposed findings at ¶ 26), and for carpet cleaning in the amount of $150 (*Id.* at p. 12). Mountain States asserts damages for these two items in the same amounts (Defendants' proposed findings, ¶¶ 338-341, 346). Accordingly, the amount of $6,361 must be deducted from any amount due to Blue Star.

Mountain States also seeks $840 in damages from Blue Star for allowing Blue Star to use certain of its equipment, and $9,660 for labor it claims to have supplied for Blue Star's benefit (Defendants' proposed findings, ¶¶ 342-45). Both of these aspects of Mountain States' damages claim are denied. There is no indication of any agreement by Blue Star to pay for the use of the borrowed equipment, nor is there any indication that charging for such equipment was even discussed with Blue Star. The claim for labor supplied relates to time spent by Bobby Vigil, a Mountain States supervisor, assisting Blue Star in removing some piping from Building 56 (Tr. 10/9/97 at 153; 238-40). However, once again there is no evidence of any agreement by Blue Star to pay for the use of the borrowed labor, nor is there any indication that charging for such labor was even discussed with Blue Star. From the testimony of Mr. Vigil, it appears that he was directed by Mr. Steele to provide the assistance to Blue Star, and not that it was requested by Blue Star (Tr. 10/9/97 at 238-39).

Mountains States asserts that it had to repair a condensate line that was cut by

Blue Star at a cost of $800, and seeks this amount as damages (Defendants' proposed findings at ¶ 348).  This claim is also denied, as the minimal amount of testimony by Ms. Robertson on this item is too vague to permit a finding the Blue Star was responsible, or even to ascertain the amount actually incurred for the asserted damage (*see* Tr. 10/9/97 at 156).

2. The emergency clean up in Areas 1700 and 2700

Mountain States also asserts that after Blue Star left the job on or about October 24, 1994, it discovered that asbestos remained in Areas 1700 and 2700, necessitating the performance of emergency clean ups by DLM, for which Mountain States paid DLM $13,595.65 and $35,127.47, respectively (Defendants' proposed findings, ¶¶ 294-303; 304-329).  Mountain States seeks recovery of these amounts as damages for breach of contract by Blue Star.

With respect to Area 1700, the testimony reflects that there was a need for further asbestos abatement to be performed in the area after Blue Star left the job.  Mr. Moises Alarcon, an officer of DLM, testified that he found conditions in Area 1700 that necessitated abatement work including at least a need to remove pipeline, asbestos insulation on the pipe, asbestos material left in cabinets and on chairs, VAT adhesive and pipe fittings (Tr. 10/8/97 at 83-84).  Mr. David Tuety, an employee of DLM, identified photographs he took of the conditions in Area 1700, and described the conditions as "not the normal way to leave a work area." Tr. 10/7/97 at 127-29. The cost incurred by Mountains States for DLM to perform this work was $13,595.67.  There is no reason to find that this amount was unreasonable or excessive given the circumstances under which the work was performed.  Had Blue Star done an adequate job of removal of

asbestos in Area 1700, Mountain States would not have incurred these charges.

However, whether Mountain States can recover these expenses under its theory of breach of contract is a separate question. Although Mountain States now characterizes the work performed by DLM as an "emergency cleanup" of Area 1700, there is a dearth of evidence that this cleanup was treated as an emergency, as opposed to that performed in Area 2700. First, as noted above, Mr. Moises Alarcon described the work that had to be performed, and Mr. Tuety characterized the situation as not the way to leave a job, but not necessarily as an emergency clean up. Second, the DLM invoice for the work performed in Area 1700 describes the work as "clean up of Area 1700" (*see* Exhibit 153), whereas the DLM invoice for the work performed in Area 2700 expressly describes it as an "emergency cleanup." (*see* Exhibit 153). The invoice for the work performed in Area 1700 also indicates that the work did not start until November 17, 1994, almost one month after Blue Star left the site, not indicative of an emergency situation. Third, whereas testimony was elicited from Mr. Wade Anderson regarding the need for taking air samples in Area 2700 because of its condition in October 1994 after Blue Star left the job, there is no evidence that air samples needed to be taken in Area 1700 (Tr. 10/9/97 at 222-24). Finally, a letter from Mountain States to Blue Star dated November 4, 1994 (Exhibit 79), notifying Blue Star of the situation, describes the work in Area 1700 as "incomplete," and does not describe the situation as an emergency. I cannot find that the condition in Area 1700 necessitated an emergency clean, but rather was the result of incomplete or defective work.

The subcontract expressly provides that Mountain States can recover expenses it incurred because of the failure of Blue Star to perform its work free of defects (Exhibit 3,

additional provisions at ¶ 21) or because Blue Star failed to adequately clean the premises after it finished asbestos removal (*Id.* at ¶ 22), and either provision may apply with respect to the situation involving Area 1700. Both of these contract provisions require Mountain States to provide written notice to Blue Star of the asserted defect, or the asserted failure to clean up, and provide it with an opportunity to correct the situation. The above-mentioned letter of November 4, 1994 provides the requisite written notice to Blue Star as it describes the incomplete work in Area 1700, and urges Blue Star to obtain a certificate of insurance so that it can complete the work (Exhibit 79 at 2). Although Blue Star may not have been given a year to correct the defect, as provided in the additional provision of the subcontract, it was apparent from the circumstances that the work, although not an emergency, had to be completed before the project could continue. Accordingly, I find that it was reasonable for Mountain States to retain DLM to clean up the defective work in Area 1700, and that it should recover the $13,595.67 it paid to DLM in accordance with paragraph 21 or 22 of the additional provisions of the subcontract.

With respect to Area 2700, the testimony and evidence reflect that there was a need for an "emergency" clean up of the area after Blue Star left the job in October 1994. As noted, air sampling was taken in the area and came back "elevated" above acceptable standards (Tr. 10/9/97 at 222). Mr. Lon Alarcon, an employee of DLM, described the clean up in Area 2700 as an emergency, explaining that it was considered as such because of the source of contamination and the need to proceed without waiting for the issuance of a permit (Tr. 10/9/97 at 198-200). The invoice for DLM's work indicates that they viewed the clean up as an emergency at the time, and that the work

commenced on November 1, 1994, shortly after Blue Star left the project (*see* Exhibit 153). The November 4, 1994 letter to Blue Star describes the situation in Area 2700 as requiring remediation by the Jefferson County Health Department (Exhibit 79 at 2).

Thus, unlike the situation in Area 1700, the clean up work performed by DLM in Area 2700 was an emergency. The cost incurred by Mountains States for DLM to perform this work was $35,121.74. There is no reason to find that this amount was unreasonable or excessive given the circumstances under which the work was performed. The subcontract gives Mountain States the right to collect damages from Blue Star for any loss, claim or expense caused in whole or in part by an act or omission of Blue Star (Exhibit 3, additional provisions ¶ 17). Thus, the question is whether it was Blue Star's conduct which caused the need for the emergency clean up.

Ms. Robertson testified that Mountain States did not know the source or the cause of asbestos contamination in Area 2700 after Blue Star left the job (Tr. 10/9/97 at 172-73). Although she stated that Blue Star did not clean up floor tile that it was supposed to clean, and although it failed to properly remove a unit heater that had asbestos by leaving it outside the containment, she also stated that nobody could identify if the high counts of asbestos came from the floor or some other activities that had occurred (*Id.* at 173-75).

Blue Star has suggested that the contamination came from floor tiles that were crushed and from a wall that was demolished by another subcontractor after it left the job (Plaintiff's proposed findings at ¶ 21). Mountain States correctly responds that Blue Star offered little or no evidence to support its theory (Defendants' proposed findings, ¶ 320; 58-59). However, the burden of proof is not on Blue Star to prove that it did not cause

35

the emergency situation in Area 2700, but rather on Mountain States to prove that Blue Star caused the conditions which necessitated an emergency clean up. I find that although the inference can be made that the asbestos contamination occurred in Area 2700 while Blue Star was working on the site, given Mountain States' admission that it did not know, and nobody could identify, the source of the activity that caused the asbestos contamination, Mountain States failed to meet its burden of proof. Accordingly Mountain States' claim for damages for the purported emergency clean up in Area 2700 is denied.

### 3. Completion of Blue Star's subcontract

Mountain States claims that it also was required to contract with DLM to finish the portion of the work covered by Blue Star's subcontract which was unfinished at the time Blue Star left the job in October 1994. The subcontract provides the right to Mountain States to complete work that has not been completed (Exhibit 3, additional provisions ¶ 24). The additional provisions specify that Mountain States may deduct such expenses incurred to complete the work from the subcontract price, or if the amount exceeds the subcontract price, Mountain States may collect the excess amount from the subcontractor, with interest at 12% until paid (*Id.*). Mountain States claims that it is entitled to $66,168.61 for amounts it paid to DLM to complete the work in Areas 1500, 1700 and 2700 (apart from the emergency clean up claims discussed above) as either a set off from any amounts due to Blue Star, or as damages (Defendants' proposed findings, ¶¶ 330-34).

Blue Star does not dispute that there was unfinished work in those areas when it left the job, nor that Mountains States is entitled to some compensation for the amounts

paid to DLM. It contends, however, that the remaining unfinished portion of its subcontract work did not exceed 12.5% of Blue Star's agreed amount, and therefore reasonable damages to Mountain States should not exceed 12.5% of its subcontract price, or $26,650 (Plaintiff's proposed findings, ¶ 22).

Blue Star's approach is too simplistic to support a calculation of damages. First, the testimony as to what percentage of the total job remained unfinished at the time Blue Star left the project is mostly speculative, or at best an estimate. Moreover, even if there were an ascertainable percentage of the quantity of work remaining, there is no basis for finding that the cost of finishing the unfinished portion is exactly proportionate to the percentage of the job unfinished.

Mountain States, recognizing that a finding of reasonableness is necessary, asserts that the amounts it paid to DLM to finish the work were reasonable for the work performed. Specifically, it claims that it paid DLM $6,105 for tile and mastic removal in Area 1500,[6] and $60,063.61 for asbestos abatement in Areas 1700 and 2700 (Defendants' proposed findings, ¶¶ 330, 333). However, in order to determine if these amounts are reasonable for the work performed, it is necessary to examine the details of the underlying work.

---

[6] During trial Blue Star objected to Mountain States' request for damages for work performed by DLM in Area 1500 to the extent the work involved abatement of asbestos found in the ceiling, asserting that such abatement was an unanticipated discovery of asbestos, and therefore not part of Blue Star's contract work (Tr. 10/7/97 at 109-10). A letter from Mr. Tuety to Ms. Robertson dated December 6, 1994 (*see* Exhibit 83), proposing additional work by DLM, seems to confirm Blue Star's position, as it describes this situation as "a condition that was not anticipated when the project was bid" *Id.* However, it is now clear from Defendants' proposed findings that Mountain States is claiming damages only for removal of floor tile and mastic in Area 1500, and not abatement of the asbestos in the ceiling.

Exhibit 83, a multi-page exhibit that appears to comprise much of the documentation relating to DLM's work on Building 56, contains a bid dated October 2, 1994 in the amount of $60,876. A separate sentence in the bid letter references a price for tile and mastic removal in the amount of $6,105. A separate letter found in Exhibit 83 from DLM to Ms. Robertson dated October 7, 1994, contains a "schedule of values" that sets forth the categories of the DLM bid by labor, equipment and supplies, profit and overhead on the labor and equipment, as well as out of pocket costs such as air monitoring costs, disposal fees, insurance and bonding. The schedule of values totals $60,876. Although the bid and the schedule of values appear to reference asbestos abatement only in Area 1500, the amount of $60,876 set forth in the bid apparently became the base price for the work to be performed in Areas 1700 and 2700 by DLM pursuant to the subcontract entered into between DLM and Mountain States on October 21,1994, which sets forth the base price at $60,876 (see Exhibit 150 at 1). From the testimony offered at trial by Mr. Tuety of DLM, it appears the DLM ultimately agreed to perform the necessary work in Areas 1700 and 2700 for a "not to exceed" price of $60,876 (Tr. 10/7/97 at 143). It appears that the total "not to exceed" price was subsequently allocated, by a bid dated December 6, 1994, to the different phases of the work to be performed in Areas 1700 and 2700 (see Exhibit D-1).

In support of its assertion that the amounts paid to DLM are reasonable, defendants also offered evidence at trial through Mr. Tuety, who identified six DLM invoices for the different portions of DLM's work, each of which references the area of Building 56 where the work was performed, provides a general description of the work, and sets forth the amount of the charges with a breakdown as to the labor, the profit and

overhead on the labor, and the out of pocket expenses for the materials, supplies and other components of the job.  As described by Mr. Tuety, Exhibit D-13 identifies work performed removing asbestos in the bathrooms of Area 1700 for a total cost of $10,802.91; Exhibit D-14 identifies work performed removing asbestos from floor tile and piping in the optical lab in Area 1700 for a total cost of $14,483;  Exhibit D-17 identifies work performed removing asbestos from the ceiling in Area 1700 for a total cost of $412.92; Exhibit D-11 identifies work performed removing asbestos from floor tile and mastic, apparently in Area 2700 for a total cost of $ 10,392.76; Exhibit D-12 identifies work performed removing asbestos from floor tile and mastic, also apparently in Area 2700 for a total cost of $11,329.94; Exhibit D-15 identifies work performed removing asbestos via a glove bag removal from piping, also apparently in Area 2700 for a total cost of $13,055 (Tr. 10/7/97 at 145-53).

The total of these six invoices is $60,476.53.  This total is somewhat less than the "not to exceed" price set forth in the DLM subcontract (Exhibit 150) and substantially less than the amount bid by DLM on December 6, 1994 (Exhibit D-1).  In the one instance where the cost of the phase exceeded the amount guaranteed, DLM reduced the charges to the guaranteed price (*see* Exhibit D-14).

Based on Mr. Tuety's testimony, the six invoices submitted and the detail describing the work performed, the rates of profit and overhead applied, the specification of the charges for materials and supplies which were not challenged at trial, the equipment used and the out of pocket charges incurred by DLM, I find that the amounts paid by Mountain States to DLM to complete the performance of Blue Star's obligations in Areas 1700 and 2700 under the subcontract are reasonable.  Mountain States is

39

entitled to recover as a set off or as damages the amount of $60,476.53 for the costs incurred in completing this work. I do not find that a demand for this amount was made by Mountain States prior to the filing of its counterclaims on March 5, 1996.

Mr. Tuety also testified that in addition to the above work, DLM performed work pursuant to a change order in Area 1500 at a price of $6,105 (*Id.* at 154). Although this change order is referenced in Exhibits 151 and 152, and appears to relate to tile and mastic removal as bid by DLM in its letter of October 2, 1994, the exhibits do not apparently include a document or invoice from DLM specifically detailing this work. Nor did Mr Tuety's testimony provide a description of the actual work performed. Ms. Robertson's testimony describes generally the nature of the work that was done, and explains why she felt it was reasonable to hire DLM to perform the work (Tr. 10/9/97 at 147-50). But without some evidence of the hours of the work performed, the rates of profit and overhead applied, the specification of the charges for materials, supplies and the equipment used, and the out of pocket charges incurred by DLM, I cannot make a determination as to reasonableness of the amount sought for tile and mastic removal in Area 1500. Accordingly, I do not award an off set or damages to Mountain States for this item.

Mountain States asserts that it is also entitled to a 10% fee for the time expended by Ms. Robertson "administering DLM's contract." (Defendants' proposed findings at ¶ 336). Although Mountain States' proposed findings do not quantify the amount it claims, Ms. Robertson testified that the amount would be $12,129 (Tr. 10/9/97 at 154). Mountain States, however, has not provided any basis for a finding that such a fee is a reasonable amount to pay for administration. In any event, this claim is denied, as I see

no reason to assess such a fee against Blue Star. If the substitution of DLM for Blue Star was a changed condition of Mountain States' contract, it should have submitted an application to the GSA for payment of the administration fee.

Mountain States requests an award of attorneys' fees, asserting that Blue Star pursued this litigation vexatiously and in bad faith (Defendants' proposed findings at p. 62). I do not find that Blue Star acted vexatiously, or in bad faith, or that its claims were frivolous, and therefore attorneys' fees will not be awarded to Mountain States.

## III. CONCLUSIONS OF LAW

The pertinent provision of the Miller Act at the time Blue Star's claim was filed in 1995 provided as follows:

> (a) Every person who has furnished labor or material in the prosecution of the work provided for in such contract, in respect of which a payment bond is furnished under sections 270a to 270d of this title and who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for which such claim is made, shall have the right to sue on such payment bond for the amount, or the balance thereof, unpaid at the time of institution of such suit and to prosecute said action to final execution and judgment for the sum or sums justly due him: . . .

40 U.S.C. § 270(b)(a) (1995). A claimant who fails to prove that payment is "justly due" may not prevail under this statute. *United States for Use and Benefit of Eastern Gulf v. Metzger Towing*, 910 F.2d 775, 781 (11th Cir. 1990). It was not the intention of Congress to extend or enlarge the liability of the surety under a Miller Act bond beyond the contractual or quasi-contractual obligations of the contractor who remains primarily liable. *Id.*, citing to *United States ex rel. Harrington v. Trione*, 97 F. Supp. 522, 526 (D. Colo.1951). Thus, Blue Star's rights under the alleged payment bond are not greater

than its rights against Mountain States under the subcontract.  As no amounts are due against Mountain States under the provisions of the subcontract, no amount is "justly due" under the payment bond.

Recovery in *quantum meruit* recovery is generally allowed under the Miller Act under certain circumstances.  *See, e.g. United States v. Western States Mechanical Contractors*, 834 F.2d 1533, 1539 (10th Cir.1987).  However, the right of Blue Star to receive *quantum meruit* damages here would not be greater under the payment bond than its rights against Mountain States.

Under Colorado law, which governs Blue Star's claims against Mountain States, claims for recovery in *quantum meruit* are an appropriate basis for recovery only when changes in a construction project occur which are not covered by the contract, are not within the contemplation of the contract, and the effect of the changes is to cause substantial loss to the contractor.  *Scott Co. of California v. MK-Ferguson Co.*, 832 P.2d 1000, 1002-03 (Colo. App. 1991).  Generally, where the contract contains a mechanism for a subcontractor to seek amendments to the contract to address the purported changed conditions, and the subcontractor fails to employ such mechanism, he is not entitled to seeks damages by way of *quantum meruit*.  *Id*. at 1004-05.

Blue Star's subcontract, like the contract at issue in *Scott Co., supra*, contained a mechanism for it to seek amendments to the base price it was to be paid.  Blue Star employed that mechanism with respect to a number of changes, and purported, but failed, to use it with respect to the work for which it claims $100,000, as set forth above. It cannot now claim in *quantum meruit* that it rendered services or materials that provided value to Mountain States beyond what it was paid.

42

Blue Star, relying on *Schuck Corp., v. Sorkowitz*, 686 P.2d 1366 (Colo. App. 1994), argues that the *Scott Co.* decision does not apply here because its claim is based on conduct of the parties that occurred subsequent to the execution of the express contract, and that it did not anticipate Mountain States taking actions contrary to the terms of the contract (Plaintiff's Response to Defendants' Motion For Judgment as a Matter of Law (Dkt. # 91) at 2-3).  While the work performed by Blue Star obviously took place after the execution of the subcontract, I do not find any conduct by Mountain States subsequent to the execution of the subcontract that would give rise to an implied contract or an expectation by Blue Star that it would be paid the "reasonable value" of its services rather than the price agreed to in the subcontract, or that it would be paid additional compensation by any means other than the equitable adjustment mechanism contained in the subcontract.  The enforceable contract covers the subject matter and therefore there can be no claim under a theory of *quantum meruit*.  *Interbank Investments LLC, v. Eagle River Water and Sanitation District*, 77 P.3d 814, 817 (Colo. App. 2003).

Even if Blue Star were permitted to proceed in *quantum meruit* against Mountain States, I conclude that it failed to prove that the reasonable value of its purported additional work outside the scope of its contract had a value of $100,000.  No expert credibly testified that such was the value of the purported work.  Mr. Scherling's testimony as to plaintiff's damages Exhibit 162 does not supply any valid basis for finding that the amount of purported extra work is $100,000 (*see* Tr. 10/6/97 at 47-48).  He certainly did not testify to such a number.

Blue Star is not entitled to recover on its First Cause of Action against National

Fire, asserting a claim under the payment bond, because there are no amounts justly due to it for which it has not been paid. Other than as to the change orders discussed above, Blue Star is not entitled to recover on its Second Cause of Action against Mountain States, alleging breach of contract, because it did not show that it performed work beyond the scope of the contract, and because it did not comply with the contractual requirement to timely submit requests for equitable adjustments or requests for information. Blue Star is not entitled to recover on its Third Cause of Action against Mountain States, asserting a claim for recovery under *quantum meruit*, because such claim is precluded under the circumstances here by the mechanisms contained in the express contract that permitted Blue Star to seek equitable adjustments for extra work, and because it failed to demonstrate the reasonable value of the services it claimed to provide beyond the scope of the contract.

Mountain States is entitled to recover on its First Counterclaim alleging breach of contract by Blue Star for the items of damage discussed above. Mountain States Second Counterclaim, alleging an alternative claim under a theory of *quantum meruit,* is mooted by its recovery under the First Counterclaim.

I do not find that Blue Star pursued its claims in bad faith, and no attorneys' fees shall be awarded to Mountain States.

### Summary of the Damages Claims

Based on the above findings and conclusions of law, I order that Blue Star is entitled to $283,074 for the work performed pursuant to its subcontract, which includes the base amount of $210,000, plus amounts allowed for change orders and additional work. Blue Star has been paid $239,905.89, leaving an amount owing of $43,168.11.

I find, however, that Mountain States is entitled to set off against this amount: (1) the damages caused by Blue Star in the amount of $6,361; (2) the costs incurred under paragraph 21 of the additional provisions of the subcontract to correct the defective work in Area 1700 in the amount of $13,595.65; and (3) the amount it expended to ensure completion of Blue Star's work, pursuant to paragraph 24 of the additional provisions of the subcontract, in the amount of $60,476.53, plus prejudgment interest on that amount alone at 12% per annum as provided in paragraph 24 of the additional provisions, from March 5, 1996 until entry of judgment.

Whereas the total set off exceeds the amount due to Blue Star, a net judgment shall be entered in favor of Mountain States and against Blue Star. The parties are directed to confer and endeavor to agree on a stipulated net amount of the judgment to be entered in favor of Mountain States that takes into account the award of prejudgment interest. The parties shall file a stipulated proposed judgment within 10 days of the entry of this Order.

Defendants' motion for judgment as a matter of law under Rule 52(c), F. R. Civ P. (Dkt. # 87) is DENIED. All other pending motions are denied.

Dated: July 15, 2008

_____
UNITED STATES DISTRICT JUDGE
SITTING BY DESIGNATION